HILL *v.* STATE.

(In Banc. Feb. 11, 1946.)

[24 So. (2d) 737. No. 36054.]

**J. F. Dean**, of Senatobia, for appellant.

**Greek L. Rice**, Attorney General, by **R. O. Arrington**, Assistant Attorney General, for appellee.

**L. A. Smith, Sr., J.,** delivered the opinion of the court.

Appellant was indicted and convicted of the murder of Robert White in the Circuit Court of Tate County and sentenced to life imprisonment, the jury having been unable to agree on the punishment. This is the second appearance of this case in this court, the appellant having been previously convicted, appealed, and the cause reversed for reasons not now here present. Hill v. State, 196 Miss. 503, 16 So. (2d) 626.

Upon this present appeal, the appellant argues that the verdict of the jury must be based upon the testimony of Robert Thomas, alleged to have been thoroughly discredited and to be unworthy of belief, and the verdict is due to prejudice and passion and not to credible evidence showing the guilt of appellant beyond a reasonable doubt. However, the argument for appellant is principally an attack upon the testimony of the state's witness, Robert Thomas, and upon his credibility, and the effect thereof upon the verdict of the jury. Discrepancies between the testimony of Thomas in the instant trial on re-

mand and the first trial of the cause are emphasized, as well as his impeachment by a number of witnesses because of his alleged bad general reputation for truth and veracity,—several witnesses stating that they would not believe him on oath.

The contention of the state is that Robert White, the deceased, and his wife had been having trouble about appellant and that White and his wife, Maybelle, had separated. White, the deceased, sent to Senatobia for witness Thomas to come and take him to the home of a certain woman, Katie Butler, so that he could see his wife. Thomas agreed, and White and he in Thomas' car, with Hill Walton also, made the journey. Upon arrival at the home of Katie Butler, appellant and Maybelle were there, also Katie Butler and her small children. Thomas also testified that, on Monday night preceding the Wednesday of the killing, he had been at Katie's house and found appellant and Maybelle in the bed together. On the occasion here, at the time of the killing, Thomas claimed that he told Maybelle, after going into the house, that her husband wanted to speak to her and that she was sitting in appellant's lap, and that Maybelle replied "If Robert White wants to see me I reckon he knows where I am." Thereupon, Thomas says he turned around and went back to his car, which was parked in the road in front of the house at the foot of a declivity. Appellant, according to Thomas, came out of the house behind him, which was unknown to him until he slid down the declivity and in doing so turned around and saw appellant beind him. It was raining and early in the night. Appellant was then about twelve feet from the car, at which were Robert White and Hill Walton, standing. Robert White, the deceased, spoke to appellant and said, "Billie, I want to speak to you a minute," to which appellant replied "All right," and wheeled and went to shooting him, according to the version of Thomas. Robert White was unarmed. After the shooting, appellant ran east, and Robert White was carried to the doctor. He died as a result of this shot a few days later.

According to the defense, after the separation of Maybelle and Robert White, Maybelle took refuge in the home of Katie Butler. There was no intimacy between Maybelle and appellant, appellant had not visited her at the home of Katie, Thomas did not see Maybelle and appellant in the bed together, nor was she sitting in his lap when Thomas came into the house and delivered the message from her husband on the night of the killing. However, appellant was there on the fatal night when Thomas entered and told Maybelle someone out there wanted to see her and she replied "Here I is in here." Maybelle was sitting on the bed, appellant and Katie Butler were sitting in the middle of the floor. After delivery of the message, Thomas went out of the door, but he returned quickly with Robert White and Hill Walton. They asked where appellant was, and were told that he was leaving and that they had passed him on the porch as he left. On leaving her house, Katie Butler said, appellant went west and she does not know what happened except that she heard some shooting.

Maybelle White denied that there had been any improper relations between her and appellant, and stated that he stopped at Katie's house on the Wednesday evening of the killing merely in order to get out of the rain and not to see her, and she was not sitting in his lap. She heard Thomas call appellant twice after his departure from the house, and the next thing she heard was the shooting. Maybelle and Katie were corroborated by William Butler, a son of Katie, who further testified that when Billie Hill left his mother's home, Robert White, the deceased, Robert Thomas and Hill Walton went out behind him, and all three of them followed appellant up the road. Later, he heard the shooting in that direction, some distance from the car. He denied that appellant went to the car at all.

Hill Walton was in Arkansas at the time of the trial from which this appeal comes here, but there was an agreement that the defendant "also introduce the record of testimony of the former trial of this case, it being

agreed that the record states all testimony correctly.'' So that we find from the record of his testimony in the former trial his version of what happened. He said that Robert White, the deceased, told Robert Thomas to go and tell his wife to come out where the car was parked and that Robert went into the house, and on his return appellant followed behind him, and that when appellant reached the road where the car was, he pulled out his pistol and went to shooting deceased, who was doing nothing to him whatever, but was merely standing by the car, and was unarmed. He said he did not go into the house, and the first he saw of appellant on that occasion was when he followed Thomas out to the car. The witness is a first cousin of the slain man. Robert White was put in the car and carried to the doctor. Appellant ran but no one pursued him, and none of the three were armed with any sort of weapon.

It will be seen from the foregoing references to the evidence in this case that the verdict of the jury was based on conflicting testimony, and that a substantial part of the state's evidence was given by Robert Thomas, who, as stated, as impeached as to his reputation for truth and veracity by several witnesses. Hill Walton was not impeached.

Appellant did not testify in the case from which this present appeal was taken, but he did testify in the former trial that he stopped at Robert's house to get out of the rain and stayed there about fifteen minutes when Robert White, the deceased, Robert Thomas and Hill Walton came in the car which stopped out in the road, and Robert Thomas came in the house and told Maybelle somebody out there wanted to see her and that Maybelle said ''Here I is in the house.'' Robert Thomas then went out the door and came back with Robert White and Hill Walton, whereupon appellant left and ran up the road. Deceased called him twice but he refused to stop, whereupon the three men pursued him until he told them that he could run no further and begged them to let him alone. However, Robert Thomas, he says, suggested that they

kill him, the appellant, and at the time Robert had a piece of iron in his hand and that Hill Walton had a stick and deceased a pocketknife. Under these circumstances, he said he shot Robert White after some colloquy about appellant's relations with Maybelle, in order to protect himself, and after the shooting he ran off down the road.

The jury, of course, were the triers of fact, charged with the duty of rendering a verdict according to the evidence. They were the sole judges of its weight and the credibility of the witnesses, Witt v. State, 159 Miss. 478, 132 So. 338; Henderson v. State, 187 Miss. 166, 192 So. 495. In the exercise of this judgment, they accepted the testimony offered on behalf of the state as presenting the truth of what occurred, which testimony included the evidence given by Robert Thomas, and it is not for us to say that their verdict should be set aside unless manifestly wrong and against the overwhelming weight of the testimony. In this case, it might appear that the state's case was substantially based on a discredited witness, but the jury had its responsibility, as stated, and apparently believed him to be telling the truth on this occasion. We cannot measure how much they believed, or how little. Nor can we appraise how little or how much of the evidence on behalf of appellant the jury believed. The jury had the right to believe portions of testimony of witnesses, rejecting other portions. Triplett v. State, 159 Miss. 365, 132 So. 448. However, the testimony of Hill Walton, in our judgment, was sufficient to convict if the jury believed it to be true, as they apparently did.

As stated, we have no way of ascertaining what weight or effect the trial jury really gave to the testimony of Thomas, and we cannot say from the mere verdict of guilty in this case that it was founded solely on his testimony, especially where there is another witness, whose testimony materially corroborated him. Manifestly, by their verdict, the jurors declared their conviction that appellant was guilty of the crime charged against him,

and even though the key witness for the state may have been impeached by several witnesses as to his credibility, and there were discrepancies in his testimony rendered on the occasion of the two separate trials, it was the province of the jury to pass upon the credibility of the witnesses, and also the discrepancies in the testimony of the witness given on the former trial and his testimony in the present trial. Wells v. State, 112 Miss. 76, 72 So. 859. It is stated in C. & R. Stores, Inc., v. Scarborough, 189 Miss. 872, 196 So. 650, 651, by the Court that: "The production of testimony that the witness's reputation for truth and veracity is bad in the community in which he lives does not, of itself, destroy such testimony, but merely affords a basis for the jury's belief or disbelief. If they think it is worthy of belief, in the light of such convincing testimony, the jury may accept the evidence if they believe it to be true regardless of the fact that the witness's reputation for truth and veracity in the community may not be good. In the case here, there was testimony, other than that given by the impeached witnesses, which corroborated the testimony of the appellee and her husband." In the case at bar, the testimony of Hill Walton substantially corroborated that of the impeached witness Thomas. There is sharp conflict, as is manifest, supra, between the testimony for the state and the testimony for the appellant, and the jury on their oaths returned a verdict of conviction against appellant.

Even were we able to say that had we been members of the jury we might have returned a different verdict, but to which we do not commit ourselves, an appellate court cannot disturb a verdict of guilty, merely because they would have rendered an opposite verdict, had they been sitting in the place of the jury. Jackson v. State, 105 Miss. 782, 63 So. 269.

Nothing in the record intimates that the verdict was induced by passion or prejudice on the part of the jury against the appellant. He has been twice convicted by different juries of the same offense. We have given careful consideration to the able argument of counsel on his

behalf but are convinced that we should not disturb the verdict of the jury for the alleged errors assigned here.

The judgment of the trial court will therefore be, and hereby is, affirmed.

Affirmed.